UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                  Case No. 23-cr-20100

     v.                          HON. MATTHEW F. LEITMAN

D-1   CALVIN ZASTROW,
D-2   CHESTER GALLAGHER,
D-3   HEATHER IDONI,
D-5   JOEL CURRY,
D-6   JUSTIN PHILLIPS,
D-7   EVA EDL, and
D-8   EVA ZASTROW,

                    Defendants.

_____/

## GOVERNMENT'S TRIAL BRIEF

The government files this brief to provide an overview of the case and address anticipated legal issues that may arise at trial.

## I.    The Indictment

The Indictment charges the defendants with conspiracy against rights (Count One) under 18 U.S.C. § 241, which requires the government to prove three elements: (1) the defendant joined an agreement with one or more persons, either at the time the agreement was first reached or at some later time while the agreement was still in effect; (2) the aim of the agreement was to oppress or

1

intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States; and (3) at the time the defendant joined in the agreement or understanding, the defendant intended to oppress or intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States. *See United States v. Gallagher*, 3:22-cr-00327 (M.D. Tenn.), Jury Instructions (modified to remove "threaten").

The Indictment also charges the defendants, as a principles or aiders and abettors, with clinic access obstruction (Count Two) under 18 U.S.C. § 248(a)(1), known as the FACE Act, which requires the government to prove three elements: (1) the defendant engaged in physical obstruction; (2) the defendant, by his physical obstruction, intentionally interfered with Sarah (Patient A in the Indictment), or any employee of, or a patient of, the Northland Family Planning Clinic; and (3) the defendant acted because Sarah or any Clinic patient was obtaining, or any Clinic employee was providing, reproductive health services.

Additionally, the Indictment charges defendants Idoni and Edl with a second FACE Act violation (Count Three). The elements are the same as Count Two but here, the government has to prove that the defendant intentionally interfered with K.T. (Employee B in the Indictment), or any employee of, or a patient of, the Women's Health Clinic.

2

II.    **Summary of Expected Facts**

   A.    **Northland Family Planning Clinic (Sterling Heights)**

On August 27, 2020, the defendants used their bodies to physically blockade the doors to the Northland Family Planning Clinic (NFPC), a provider of a variety of reproductive health services located in Sterling Heights, Michigan. During the blockade, the defendants oppressed, intimidated, and interfered with patients and employees alike, without regard to which particular reproductive health service they were seeking or providing.

The defendants planned the blockade in advance. C. Zastrow organized a camping trip for a group of individuals, including his co-defendants, that included, among other things, discussion of a plan to block the entrance of a clinic that provided abortion care. The chosen clinic ended up being NFPC. Gallagher used social media to promote the blockade ahead of time, and to encourage his followers to view "live feeds" of the blockade.  On the day of the blockade, Gallagher and Curry used cell phones to livestream video of the blockade, during which they admitted their intent to "block the door" and not let "anybody in." An unindicted co-conspirator ("C.B.") also livestreamed the blockade on Facebook.

Prior to the blockade, the defendants, along with a group of individuals who lawfully protested that day, gathered near the clinic. As the group walked together towards the clinic, the defendants broke off from the lawful protestors and walked

3

towards the clinic entrance to physically block it. The other individuals remained off the clinic's property to engage in lawful protest. C.B., who was livestreaming, explained that the defendants were there to "interpose" by standing in front of the clinic door.

During the blockade, when an employee, who had already been inside the clinic before the entrance was blocked, attempted to help the clinic owner and a patient access the clinic through the employee entrance, E. Zastrow sat in front of that entrance. When the clinic owner tried to pull the door open, C.B. shouted out a warning to the blockers that people were trying to enter the clinic through the employee entrance. In response, C. Zastrow and co-conspirator/government witness Caroline Davis moved to the employee entrance and Davis sat down next to E. Zastrow to physically block the door and prevent the clinic owner and patient from entering. C. Zastrow then followed the clinic owner and patient around the building as they tried to find another way to enter.

During the blockade, patient Sarah arrived with her husband and mother for a scheduled reproductive health care appointment. Sarah and her husband, who had finally conceived via in vitro fertilization after several miscarriages, had recently learned when she was about 14 weeks pregnant that her unborn son had fatal fetal anomalies and could not survive outside the womb. Sarah also learned that carrying the baby to term would potentially endanger her ability to become

pregnant in the future. Faced with this heartbreaking news, Sarah had no choice but to terminate her pregnancy. When Sarah and her family arrived at the Clinic, they were confronted in the parking lot by E. Zastrow, who called Sarah a "murderer" and accused her of hating her baby. Sarah saw the other defendants sitting and standing in front of the Clinic entrance, making it impossible for her to enter and receive her needed reproductive health care.

When an unknown patient arrived at the clinic entrance and informed the defendants that she had an appointment for birth control, the defendants refused to move. Curry told her, "we're not letting anybody in."

Officers with the Sterling Heights Police Department arrived and directed the defendants to move, but the defendants refused. Instead, they engaged in tactics expressly designed and intended to continue blockading the entrances for as long as possible. Gallagher explained, on the livestreamed video, that the longer the defendants engaged the police in conversation, the longer they could prevent patients and employees from entering the building; he specifically stated, "that's what obstructing the door of an abortion clinic is about and why it's so successful. We are here blocking access so the doors can't open." Edl and C. Zastrow also engaged the police in conversation in an effort to allow the blockade to continue. Ultimately, each of the defendants either blocked the clinic's entrances or aided and abetted their co-defendants in doing so.

**B.   Women's Health Clinic (Saginaw)**

On April 16, 2021, defendants Idoni and Edl used their bodies to physically blockade two entrances to the Women's Health Clinic in Saginaw, Michigan. Clinic employees contacted the Saginaw Township Police Department. The blockade is captured by the responding officers' body-worn cameras. When the officers arrived, a group of around thirty protestors, including C. Zastrow and Davis, were engaged in lawful protest to the side of the clinic's property. Defendants Idoni and Edl were on the clinic's property, blocking two of its entrances. Idoni lay prone in front of one entrance, and Edl sat in front of the other.

The officers spoke with Idoni and Edl extensively in an attempt to get them to leave the property voluntarily. In the course of these exchanges, both defendants admitted that their intent was to block patients from receiving reproductive healthcare, and to prevent clinicians from providing such care. Early in the interaction, one officer asked Idoni, "what is your intent here today?" and she responded, "to stay here as long as I can to prevent babies from dying. And usually they are rushing in right about now. Usually all the moms come in very quickly." Idoni also told the officers, "We are not protestors. . . .The women who don't get in here, the abortionist who doesn't get in here, even though he can come in the back door I'm sure, there's only so many of us who are willing to do this today." Before they could arrest Idoni, she informed the officers that she was chained to the door

6

frame with a bike lock around her neck, and that she would not tell them where the key was. The officers ultimately cut the lock with bolt cutters.

During Edl's interactions with the officers, she told them that she was blocking the doors because, "everything else failed, and I can't let this [abortion] go on." At one point, Edl agreed to let officers enter the clinic to speak with clinic manager, Katria Terrell. After the officers stepped inside, Terrell held the door open and motioned for a patient who had been prevented by Edl from entering, to come in. Edl quickly moved and tried to force the door closed, causing Terrell to stumble backwards.

C. Zastrow and Davis were present at this blockade, but did not block the entrance. Officers identified C. Zastrow as the "spokesperson" for the group. C. Zastrow suggested to the sergeant on scene that if they delayed arresting Idoni and Edl, more women would be prevented from obtaining abortion services.

## III.   Summary of the Law

### A.   Conspiracy Against Rights, 18 U.S.C. § 241

Count One of the Indictment charges the defendants with violating 18 U.S.C. § 241. To establish a violation of § 241, the government must prove beyond a reasonable doubt:

First:      that the defendant joined an agreement with one or
            more persons, either at the time the agreement was first
            reached or at some later time while the agreement was
            still in effect;

Second: that the aim of the agreement was to oppress or intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States

Third, that, at the time the defendant joined in the agreement or understanding, the defendant intended to oppress or intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States.

18 U.S.C. § 241. Each element is discussed in greater detail below.

**Agreement.** The first element requires the government to prove beyond a reasonable doubt that each defendant joined an agreement with one or more other people. This does not require proof of a "formal agreement" or plan in which everyone sat down and worked together on the details. Sixth Circuit Pattern Criminal Jury Instruction, § 3.02 (2023). It is enough that the government prove beyond a reasonable doubt, by direct or circumstantial evidence, that there was a common understanding among those involved as to the purpose or object of the conspiracy. *See Glasser v. United States*, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances."); *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (explaining that "[a]n agreement can be tacit, not formal, and the "government may meet its burden of proof through circumstantial evidence").

8

**Purpose.** The second element requires the government to prove beyond a reasonable doubt that the purpose or objective of the conspiracy each defendant joined was to oppress or intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States. The right to obtain, or provide, reproductive health services without interference through physical obstruction is a right secured by the laws of the United States. 18 U.S.C. § 248(c); *United States v. Kozminski*, 487 U.S. 931, 947 (1988) (A right has been "secured" by the laws of the United States when the right has been "made specific either by the express terms of the federal constitution or laws or by decisions interpreting them."). The government is not required to prove that the defendants specifically discussed their desire to violate a federal right. *Anderson v. United States*, 417 U.S. 211, 2235 (1974) (discussing nature and purpose of conspiracy and noting that a jury could find a violation of § 241 even where defendants did not specifically discuss their attempt to violate a federal right.).

**Defendant's intent in joining the conspiracy.** The third element requires the government to prove beyond a reasonable doubt that each defendant knew the main purpose of the conspiracy, that is, to oppress and intimidate a person in the free exercise or enjoyment of the right to obtain or provide reproductive health services without interference through physical obstruction, and that the defendant voluntarily joined the conspiracy intending to help advance or achieve its goals.

Sixth Circuit Pattern Criminal Jury Instruction, § 3.03 (2023).  The government does not need to prove that the defendants were thinking in legal terms but rather that they committed the acts purposely with the specific intent to do something the law forbids. *See United States v. Gallagher*, 3:22-cr-00327 (M.D. Tenn.), Jury Instructions. *See also United States v. Pomponio*, 429 U.S. 10, 11–12 (1976). "Oppress" and "intimidate" are not used in any technical sense, but instead cover any conduct intended to frighten, punish, prevent, or obstruct a person's exercise or enjoyment of a legal right. *United States v. Waddell*, 112 U.S. 76, 80 (1884) (holding that § 241 covers obstruction of rights); *United States v. LaVallee*, 439 F.3d 670, 684 (10th Cir. 2006) (approving a similar instruction); *United States v. Handy*, 1:22-cr-00096-CKK Doc. 444 (D.D.C.) (using this instruction verbatim).

### B.     Freedom of Access to Clinic Entrances, 18 U.S.C. § 248(a)(1)

Counts Two (all defendants) and Three (Idoni and Edl) of the Indictment charge violations of 18 U.S.C. § 248(a)(1). To establish a violation of § 248(A)(1), the government must establish beyond a reasonable doubt:

First:      The defendant engaged in physical obstruction;

Second:   The defendant, by his physical obstruction, intentionally interfered with patients or employees of the Clinic, or the defendant attempted to do so; and

Third:    The defendant acted as he did because patients were obtaining, or the Clinic was providing, reproductive health services.

10

The term "physical obstruction" is defined as rendering impassable an entrance to or exit from a facility that provides reproductive health services, or rendering passage to or from such a facility unreasonably difficult or hazardous.

The term "interfere with" means to restrict a person's freedom of movement.

The term "reproductive health services" means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy. 18 U.S.C. § 248(d)(5).

## IV.    The government's case-in-chief

At trial, the government plans to call witnesses and introduce exhibits to prove its case beyond a reasonable doubt.

### A.    Witnesses

The government intends to call the 12 witnesses listed on the Government's Witness List (ECF No. 324, PageID.1803). These witnesses include:

- three NFPC employees who will describe the defendants' actions on August 27, 2020, and how those actions interfered with the clinic's ability to provide reproductive health care to its patients;

- one NFPC patient who had an appointment on August 27, 2020, and will describe how the defendants' actions intimidated her and interfered with her access to the clinic;

- the NFPC patient's spouse and mother, who will each describe the defendants' actions on August 27, 2020, and how they observed their

11

spouse/daughter being intimidated by the defendants as she sought to access the clinic for reproductive health care;

- a cooperating defendant who will describe the nature of her agreement to oppress and intimidate NFPC patients from obtaining, and providers from providing, reproductive health care on NFPC August 27, 2020;

- a Sterling Heights police sergeant who responded to the NFPC blockade, who will describe the defendants' actions and the statements they made to law enforcement;

- a WHC employee who will describe the actions of Edl and Idoni on April 16, 2021, and how their actions interfered with the clinic's ability to provide reproductive health care to its patients;

- two Saginaw police officers who responded to the WHC blockade and captured defendant Edl's and Idoni's actions and admissions on body worn camera;

- an FBI Special Agent who will discuss the investigation, as well as records and videos obtained from some of the defendants' Facebook accounts and evidence obtained from the phone records of the defendants.

## B.    Exhibits

In conjunction with witness testimony, the government intends to introduce video, photographic, and documentary evidence as detailed in the Government's Exhibit List. (ECF No.  323, PageID.1797)[1]. The video evidence, which comprises

---

[1] The government has removed some exhibits from this list since it was filed on July 23, 2024. The defendants have been provided with updated exhibit lists.

the bulk of the government's exhibits, comes from several sources and depicts portions of the NFPC and WHC blockades from a variety of perspectives.

To prevent delays from objections that can be resolved before trial begins, the government addresses below the admissibility of the government's evidence and how that evidence will be presented.

***Facebook Videos and Records (Ex. 1A–1F, 2A–2C, 3A–3G, 4A–4L, 5A–5R, 6A–6H).*** The government's video evidence regarding Counts One and Two of the indictment includes excerpts of videos that were recorded, during the NFPC blockade, by uncharged co-conspirator Coleman Boyd, defendant Curry, and defendant Gallagher, and posted or shared on their respective Facebook accounts. The government also intends to introduce several status updates, posts, and comments made on Facebook by various defendants related to the blockade.

On July 24, 2024, at the Court's suggestion, the parties met and conferred, and the defendants have agreed to the admissibility of many of the government's exhibits, including the majority of the exhibits from Facebook records. As to those exhibits where there is no agreement, the government will establish the authenticity and admissibility of these exhibits through a variety of methods including self-authenticating metadata and subscriber information from the Facebook records, portions of the Facebook records where the defendants identified themselves, and testimony from witnesses who have personal knowledge

13

of what is depicted in the videos or have communicated with the defendants on their respective Facebook accounts. *See* Fed. R. Evid. 901(b).

*NFPC Employee Videos (Ex. 7A–7C, 8A–8C, 9A–9D).* The government intends to introduce videos and still shots from cell phone recordings made by three NFPC employees who were present during the blockade and used their cell phones to record the defendants' actions. Based on the "meet and confer," the government understands that the defendants will agree to the admission of these exhibits.

*NFPC Security Camera Videos (Ex. 10–10C, 11–11A, 13–13E)[2].* The government intends to introduce NFPC security camera videos that captured the defendants' actions on August 27, 2020. Based on the "meet and confer," the government understands that the defendants will agree to the admission of these exhibits.

*Body Worn Camera Videos of Saginaw Police Officers Sauve and Myers (Ex. 14A–14I, 15A–15J).* The government intends to introduce footage from the body worn cameras of two of the Saginaw police officers who responded to WHC and captured the actions and admissions of defendants Edl and Idoni on April 16, 2021. Based on the "meet and confer," the government understands that the defendants will agree to the admission of these exhibits.

---

[2] The government has removed Exhibit 12 and 12A from its exhibit list.

***Miscellaneous Exhibits (Ex. 16–21).*** The government intends to introduce an email authored by C. Zastrow regarding the "Michigan Holiness Revival Tour 2020" (Ex. 16), aerial photographs of both clinics (Ex. 18-19), a video depicting a portion of the NFPC clinic blockade (Ex. 20), and a March 5, 2021 video of defendant Gallagher instructing individuals outside a clinic in Mt. Juliet, Tennessee how to avoid arrest (Ex. 21). Based on the "meet and confer," the government understands that the defendants will agree to the admission of these exhibits.

The government also intends to introduce a summary chart to prove the contents of the defendants' phone records, and specifically, the number of phone contacts between and among them in the time period before and after the NFPC blockade (Ex. 17). The defendants object to this exhibit.

## V.    Miscellaneous courtroom matters

To facilitate the orderly and efficient use of the Court and jury's time, the United States requests the following courtroom procedures.

### A.    Witness sequestration (Fed. R. Evid. 615)

Federal Rule of Evidence 615 states that, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witness' testimony. Or the court may do so on its own."  This Rule encompasses most witnesses (or potential witnesses) set to testify at this trial, except for the defendant and any

victims of the case who wish to view the proceedings. Unlike many federal criminal trials, the case agent, FBI Special Agent Sean Lobar, will not be testifying and will remain in the courtroom during trial but not at counsel table. SA Lobar will assist the government in ushering witnesses to and from the courtroom.

### B.    Potential Issues Related to Courthouse and Courtroom Decorum

As the Court knows, there have been similar FACE Act trials in other districts. Based on discussions with prosecutors of those cases, there is reason to believe that there may be some issues related to the conduct of supporters of the defendants and/or spectators. For example, in Tennessee, a crowd of anti-abortion activists held inflammatory signs and shouted near the entrance where potential jurors entered the courthouse. In D.C. spectators sprinkled "holy water" in the courtroom. The government is not requesting that the Court take any particular action at this time, but will raise any concerns should any of this type of behavior come to fruition.

## VI.    Anticipated Evidentiary and Legal Issues

### A.    Stipulations

As discussed, at the Court's suggestion, on July 24, 2024, the parties "met and conferred" regarding exhibits[3]. Based on that meeting, the government's understanding is that the defendants agree to the admission of the bulk of the

---

[3] The government provided copies of its exhibits to most of the defendants on July 23, 2024. The government mailed defendant Idoni the exhibits on July 26, 2024.

government's exhibits. Likewise, the government has agreed to the admission of many of defendants Edl's and Curry's exhibits, as discussed further below. The parties intend to introduce written stipulations reflecting their agreement as to the admission of certain exhibits. The government anticipates moving for admission of the agreed-upon government's exhibits at the start of its case-in-chief.

## B.  Conditional admission of evidence (Fed. R. Evid. 104)

The evidence in this case includes numerous excerpts from videos filmed by two of the defendants (Curry and Gallagher) and an uncharged co-conspirator, C.B., and posted to Facebook. The videos contain party-opponent and co-conspirator statements of the defendants and uncharged co-conspirator.

As explained above, for those exhibits that are not covered by the stipulation, the government will establish the authenticity and relevance of the Facebook video exhibits through a combination of methods. As the Court has already found, the Facebook records are self-authenticating under Rule 902(11) and (13) but the government will need to take additional steps in order to admit some of the video clips and postings. (ECF No. 202, PageID.1709). For the video clips related to the August 27, 2020 blockade, the government will call witnesses who were present and familiar with the events and individuals depicted in the videos the government seeks to admit. Fed. R. Evid. 901(b)(1). For the Facebook posts by the defendants, in addition to the metadata/subscriber information

17

connected with each Facebook account, the government's witnesses will provide testimonial evidence sufficient to attribute a post to a particular defendant.

These exhibits may also require conditional admittance in order to secure the relevance and authenticity. To that end, the United States may request conditional admittance of exhibits from Facebook, to be admitted through Caroline Davis and/or Special Agent Brett Mason in the beginning of trial. This will "eliminate unjustifiable expense and delay . . . promote the development of evidence law, to the end of ascertaining the truth and securing a just determination."  Fed. R. Evid. 102.

### C.    Exhibits during opening statement (Fed. R. Evid. 611).

In its opening statement, the government intends to display exhibits that it will seek to admit during trial. The government's opening will be confined to a summary of the issues in the case and the evidence the government intends to offer which it believes in good faith will be available and admissible. *See*, ABA Standards for Criminal Justice 3-5.5 (3d ed. 1993); *Testa v. Mundelein, Illinois*, 89 F.3d 443, 445 (7th Cir. 1996); *see also United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988). In addition, the exhibits that the government plans to use during opening statement will be limited to the exhibits that the defendants have agreed can be admitted.

### D.      Co-conspirator Statements

The government plans to admit, pursuant to Fed. R. Evid. 801(d)(2)(E), clips from livestream videos recorded by unindicted co-conspirator C.B. and posted to Facebook.[4] Before doing so, the government will present more than sufficient evidence to establish that C.B. was a member of the conspiracy and that he made the statements on the video in furtherance thereof.

A co-conspirator's statement made "during and in furtherance of a conspiracy" is not hearsay and is admissible against all members of the conspiracy. Fed. R. Evid. 801(d)(2)(E). For a statement to fit within this rule, the government "must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course of and in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979) (citing *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978)). Under Rule 104(a), the Court is responsible for determining that each co-conspirator statement satisfies those criteria. *Id*. The Court may consider the contents of the statements at issue in determining whether the government has met its burden, although some independent corroboration that the declarant was more likely than not a conspirator

---

[4] Ex. 1B, 1C, 2A, 2B, 3A, 3B, 3D, 3E are C.B. video clips to which the defendants object.

is required. *United States v. Clark*, 18 F.3d 1337, 1343 (6th Cir. 1994)*. The

government does not have to prove that a co-conspirator declarant is unavailable,

*United States v. Inandi*, 475 U.S. 387 (1986), and there is no requirement that he or

she be charged. *See United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005)

(allowing the statement of an uncharged co-conspirator whose identity was

unknown).

The Court should have little difficulty finding by a preponderance of the

evidence that the government has met its burden under Rule 801(d)(2)(E). Caroline

Davis will testify that she was a member of the conspiracy and agreed with C.B.

and the defendants to block the doors of NFPC in order to obstruct and interfere

with the ability of patients to access reproductive health care including abortions.

Many of the defendants admitted on recorded video that their purpose in being at

NFPC was to block the doors so that patients could not enter and obtain abortions.

Another exhibit shows the defendants walking towards the NFPC parking lot with

a group of individuals who planned to lawfully protest. The defendants then veer

off from the group in a coordinated manner and head towards to NFPC entrance to

block it. Indeed, the defendants' concerted actions as seen in the various videos of

the blockade as well testimony establishes that more likely than not, a conspiracy

existed.

20

Davis will testify that livestreaming blockades, including the one NFPC, was a tool the conspiracy used to promote the purpose of their conspiracy and to encourage participation by others in the blockade. Davis will also testify that C.B. assisted the NFPC blockade by helping to plan it, speaking at the camping trip organized by defendant C. Zastrow (of which the NFPC blockade was one of the planned activities), and livestreaming the blockade while describing what was occurring.

C.B.'s statements captured in the video clip exhibits also demonstrate that he was a member of the conspiracy. For example, in Exhibit 1A, which depicts the defendants walking towards NFPC, C.B. indicates his advance knowledge of the plan as he  describes that they are going to "stand in front of the door" before the defendants even reach the entrance. In Exhibit 1C, Boyd says to an unknown individual, "I didn't know there was another door right there. There's another one there–they got doors everywhere. **We** thought this was a place with only one or two doors." Boyd's use of the word "we" indicates some advanced planning with the defendants. In Exhibit 3A, Boyd identifies a NFPC employee trying to walk a "mother" into an unblocked entrance. Boyd shouts to Eva Zastrow to warn her. In response, Eva Zastrow rushes to sit in front of that entrance. As the NFPC employee tries to pull open the door, Boyd tells C. Zastrow, "They're at the other door and they're trying to pull Eva off!" After C. Zastrow follows the employee

21

and patient around to the other side of the clinic, he returns to Boyd to report, as captured in Exhibit 3B, that the "front doors are a no go." In Exhibit 3E, Boyd tells his audience that his Facebook livestream video is a "call to action" for others to participate in blockades.

The statements of C.B. made during his livestream video recordings of the NFPC blockade will sufficiently satisfy the criteria for admission as non-hearsay co-conspirator statements.

### E.   Narrative testimony by *pro se* defendants

The Court granted defendant Idoni's request for self-representation after conducting a *Faretta* hearing. (ECF No. 93, PageID.285). Paul Stablein was subsequently appointed to serve as Idoni's standby counsel. (ECF No. 172, PageID.807).  The Court also granted defendant Gallagher's request for self-representation after conducting a *Faretta* hearing. (ECF No. 175, ECF No. 175, PageID.816). Gallagher's prior attorneys, Bradley Friedman and Steven Crampton, have remained on this case to serve as Gallagher's standby counsel.

If either defendant takes the stand, the Court may require the defendant to proceed by question-and-answer format, preferably with standby counsel asking the questions, or alternatively by means of self-interrogation. *See* Fed. R. Evid. 611(a) (the court controls the mode of examining witnesses); *United States v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014) (finding no abuse of discretion in

precluding narrative testimony by pro se defendant); *United States v. Nivica*, 887 F.2d 1110, 112 – 23 (1st Cir. 1989) (finding no abuse of discretion by requiring pro se defendant to testify by means of self-interrogation); *United States v. Gallagher*, 99 F.3d 329, 332 (9th Cir. 1996) (precluding narrative testimony "was neither arbitrary nor disproportionate to the purpose of insuring that the trial proceed in an orderly and fair manner"). The purpose of taking testimony by question-and-answer format is to afford an opportunity for opposing counsel to object to improper evidence and have objections ruled on before the evidence is heard by the jury. That opportunity is lost when a defendant is permitted to testify in narrative form, straying into irrelevant subjects without warning.

In the same vein, defendants Gallagher and Idoni should not be permitted to give what amounts to narrative testimony during their opening statements. "As for opening statements, their purpose is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *United States v. Johnson*, 299 F.Supp.3d 909, 923 (M.D. Tenn. Mar. 19, 2018) (citing *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring)). The government is concerned that these defendants, who are not trained in the law, may delve into topics that are either prohibited by the Rules of Evidence or prior rulings by the Court. The district court in D.C. had similar concerns and required the *pro se* defendant there to provide a

copy of her opening statement and closing argument in advance for the court to review. *See United States v. Handy*, 1:22-cr-00096-CKK, 9/11/2023 minute order as to Joan Bell ("As the Court explained on the record today, the Court has reviewed Defendant's proposed opening statement."). The government requests that the Court require defendants Gallagher and Idoni to testify in question and answer format and also that the Court review their proposed opening statements in advance.

### F.      Summary charts (Fed. R. Evid. 1006)

The government intends to introduce a summary chart of the defendants' phone records. In *United States v. Bray*, 39 F.3d 1104 (6th Cir. 1998), the Sixth Circuit held that summary charts, admitted pursuant to Fed. R. Evid. 1006, are substantive evidence, and that they can go to the jury during deliberation. "Under Federal Rule of Evidence 1006, a party may 'use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court,' provided that the other party has been given an opportunity to examine the entire record." *United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015) "The 'point of Rule 1006 is to avoid introducing all the documents.'" *Id*. (quoting *United States v. Faulkenberry*, 614 F.3d 573, 588–89 (6th Cir. 2010)).

Here, the government intends to introduce a chart that summarizes the

telephone records of each of the defendants, and specifically summarizing the contact between the defendants during the weeks preceding and following the NFPC blockade. The phone records of each of the defendants, and the frequency of contact between them, are not conveniently subject to examination in court. This chart is an accurate compilation of admissible records. All underlying documents as well as the summary chart have been previously disclosed to the defense.

### G.     Transcript use

The Sixth Circuit approves of using transcripts at trial to assist the jury in understanding the audio portions of certain exhibits. *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994). The Template Instructions proposed by the Court contain an instruction relating the use of transcripts. The government and defendants agreed with this instruction. (ECF No. 257, PageID.1371). In this case, the government intends to use transcripts in the form of "closed captions" running at the bottom of the video exhibits. The government has disclosed these exhibits which include the closed captioning/transcripts well in advance of trial to compare with the audio and raise any inaccuracies in the transcripts. *See also United States v. Segines*, 17 F.3d 847, 854-55 (6th Cir. 1994).

### H.     Witness impeachment by prior conviction (Fed. R. Evid. 609)

In this case, there is one government witness with a prior criminal history consisting of 6 misdemeanor convictions, all of which occurred more than ten years ago. Under FRE 609, a witness may be impeached by a prior felony conviction that falls within the last ten years. The ten years is counted from the conviction date or release from confinement, whichever occurs later in time.  FRE 609(b).  Misdemeanor convictions can only be used for impeachment if the Court can "readily determine that establishing elements of the crime required proving (or admitting) to a dishonest act or false statement." *United States v. Washington*, 702 F.3d 886, 892 (6th Cir. 2012).  Because the witness's convictions are misdemeanors, over ten years old, and include no dishonest acts or false statements, the defendants should not be permitted to impeach the witness with her prior convictions.

### I.     Defendants' Proposed Exhibits and Witnesses

The defendants who have filed exhibit lists include Calvin Zastrow, Chester Gallagher, Heather Idoni, Joel Curry, Eva Edl, and Eva Zastrow. The defendants who have filed witness lists include Calvin Zastrow, Chester Gallagher, Justin Phillips, Eva Edl, and Eva Zastrow. The government objections are as follows:

1.   **Joint Exhibit List and Joint Witness List of Defendants Calvin Zastrow, Eva Edl and Eva Zastrow (ECF No. 200, PageID.1051; ECF No. 201, PageID.1055).**

From defendant C. Zastrow, the government has received 86 pages of material that includes images of aborted fetal tissue, anti-abortion propaganda pamphlets, information on "defying tyranny" by disobeying federal law, and the like. He also provided copies of YouTube videos recorded by Caroline Davis and the addresses of most of the witnesses identified on his witness list. Because none of this material was marked as exhibits, it is unclear to the government which of the documents and videos are the items identified on the exhibit list of C. Zastrow, Edl, and E. Zastrow. There are also items included on their exhibit list that the government has not received such as "Recording/Renee Chelian" (Ex. 1) and "Fetal Model of Developing Children" (Ex. 2). Based on the materials provided and public-source research on their witnesses, the government believes that the exhibits and testimony that these defendants seek to introduce would be prohibited by the Court's order barring the defendants from introducing testimony, evidence, or argument in support of jury nullification or a justification defense." (ECF No. 202, PageID.1709, 1711). Some of the defendants' video exhibits also contain inadmissible hearsay under Rule 802. Finally, the exhibits and testimony identified on their exhibit and witness lists do not appear to be relevant under Rule 401, and

any marginal probative value would be substantially outweighed by the danger of unfair prejudice under Rule 403.

### 2. Defendant Chester Gallagher's Exhibit List (ECF No. 327, PageID.1809) and defendant Heather Idoni's Exhibit List (ECF No. 328, PageID.1811)

Defendant Gallagher's exhibit list includes one exhibit: "Chester Gallagher FB video." Defendant Idoni's exhibit list also includes one exhibit: "The body worn camera video recording of Detective Jeremy Sauve from April 16, 2021, from the time of his arrival at Women's Health Clinic to 37:05 on the video counter."

The government filed a motion in limine seeking an order to preclude any defendant from introducing their own self-serving out-of-court statements as they are inadmissible hearsay. (ECF No. 228, PageID.1260). The Court deferred until trial ruling on the government's motion to the extent it relates to the Rule of Completeness. (ECF No. 303, PageID.1712).

Much of defendant Gallagher's Facebook live video contains Gallagher's narration and self-serving statements justifying his actions. Similarly, the body worn camera video of Officer Sauve includes the self-serving statements of defendant Idoni justifying her actions. Relying on the arguments contained in the government's previously filed motion in limine, the Court should prohibit defendants Gallagher and Idoni from introducing their own hearsay statements

28

contained in Gallagher's Facebook live video or Officer Sauve's body worn camera video absent any ruling by the Court that a particular statement should be allowed by the Rule of Completeness.

### 3. Defendant Curry's Exhibit List (ECF No. 320, PageID.1793)

Defendant Curry's exhibit list consist of various clips from his Facebook video of the NFPC blockade. The government and counsel for defendant Curry have met and conferred. As a result, the government has agreed to the admissibility of the defendant's Exhibits A9 (with the government's requested modification based on the Rule of Completeness) and B. The government, however, objects to the rest of defendant Curry's exhibits on the basis of relevance (Rule 401), the danger of unfair prejudice (Rule 403), and hearsay (Rules 801-802). In addition, several of defendant Curry's exhibits are barred by the Court's rulings on the Government's motions in limine prohibiting evidence in support of a justification defense and evidence identifying defendant Edl as a death camp survivor and the like. (ECF No. 303, PageID.1710–1711).

### 4. Defendant Edl's Exhibit List (ECF No. 320, PageID.1793)

Defendant Edl's exhibit lists consists of various clips from the body worn camera of Sterling Heights Police Officer Michael Vohs. The government and counsel for defendant Edl have met and conferred. As a result, the government has agreed to the authenticity of the defendant's exhibits. The government has also

agreed to the admissibility of the majority of the defendant's exhibits. The

government, however, objects to Exhibits 1–4, 8x, 8y, and 13–16 on the basis of

relevance (Rule 401) and hearsay (Rules 801-802).

## VII.  Conclusion

The government submits this Trial Brief to assist the Court in the above-

captioned case.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

Laura-Kate Bernstein
Trial Attorney
Civil Rights Division, USDOJ
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 598-3519
Laura-Kate.Bernstein2@usdoj.gov

Frances Lee Carlson
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9696
frances.carlson@usdoj.gov

Sunita Doddamani
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9573
sunita.doddamani@usdoj.gov

Dated: August 1, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, and sent a copy of the foregoing document to the following non-ECF participants via email:  **Heather Idoni** (heather@familyclassroom.net) and **Chester Gallagher** (chetgallagher@gmail.com).